[Civ. No. 8661.   Third Dist.   Nov. 18, 1954.]

HAROLD R. HORN, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

Michael & Papas for Petitioner.

Everett A. Corten and T. Groezinger for Respondents.

VAN DYKE, P. J.—Petitioner Horn filed an application for adjustment of claim before the respondent commission. His application, made upon a form supplied by the commission, alleged that, while employed as a city fireman on September 12, 1953, by the city of Stockton, he sustained injuries arising out of and in the course of his employment, as follows: "Had pain in Chest Wall while working, resulting in Myocardial Infarction." The evidence showed that petitioner was employed as a city fireman beginning May 25, 1924. He had worked as a hoseman, as a driver of the fire chief's car, and in the fire alarm office where he received alarms and participated in sending out the indicated men and equipment. In November, 1940, he suffered a heart attack and was absent from work for about 60 days. On his return he was assigned to what was apparently the lighter duty of driving and caring for the fire chief's car. On September 17, 1953, he left work, and reported to the emergency hospital. He was examined by Dr. John T. McNally and told to go back to work. On September 28th he was examined by Dr. Virgil Gianelli, whose report was introduced in evidence. Substantially it was as follows: Petitioner complained of a burning substernal pain and shortness of breath on exertion. He said it first occurred September 12th when it awakened him and since that time he had had seven spells of pain, mostly during the night, lasting from 10 minutes to one hour, the most severe occurring three days before Dr. Gianelli's examination. His past history showed that 12 years before he had been awakened by the same type of pain at 3 o'clock in the morning and that there had been a diagnosis then of myocardial infarction. At that time he was confined to bed for 60 days. Dr. Gianelli found him to be a middle-aged, slightly obese male, weighing 192 pounds stripped, temperature 98.6, lungs clear to auscultation, blood pressure 130/90, pulse 80, no heart murmurs audible, no varicosities of extremities, blood count and urinalysis well within normal limits. We quote the following from the report:

"The important finding was on the exercise electrocardiogram when we followed Masters technique to detect coronary

artery insufficiency. Using the two step method, patient complained of shortness of breath and the same burning sensation in the anterior chest area after forty such steps. Electrocardiogram run at that moment showed an ST depression in Standard Lead 1 of 2 mm, as well as in the Precordial Unipolor Leads, 2 through 6, the greatest depression occurring in V4, where there the ST depression measured 3 mm.''

Dr. Gianelli found that petitioner was then subject to an impending myocardial infarction and accordingly adopted prophylactic treatment consisting of hospitalization and medical treatment designed to thin the blood and prevent the formation of embolisms. The doctor stated that under this treatment petitioner was improving. Hospitalization lasted about two weeks and thereafter, since petitioner again complained to the doctor that he suffered the same discomfort when walking a block or so and stated that if he took nitroglycerine he got relief, he was put on an implementary program of dicumeral. Dr. Gianelli testified that the coronary insufficiency from which he found petitioner to be suffering was normally a degenerative disease which might worsen with the passage of time. When asked if a man's work and environment might have something to do with the cause of this disease, the doctor stated that in his personal opinion the cause was unknown and hence he could not, as a medical witness, answer the question. He said, however, that responding to fires and strenuous activity over a long period of time, that is, for many years, would have a precipitating effect on the disease. He said that strain or excitement could precipitate an attack, but an attack so precipitated would occur soon after the strain. For example, he said that ''stress today would not cause a heart attack two years from now.'' He said further than any emotion or physical strain was apt to precipitate a heart attack if the subject had a coronary heart disease. He said that when he examined petitioner he found him suffering from coronary insufficiency and believed, because of the increasing frequency of his pain, that a coronary infarction was impending. Describing the coronary insufficiency which he found, the doctor testified as follows:

''A coronary artery is an artery that furnishes blood to the heart muscle, and normally, the amount of blood that any given artery can furnish is adequate for normal or average activity that human beings are subjected to and an insufficiency would be a situation in which said artery would be

incapable of furnishing that given amount of blood in a given period of time to properly nourish the muscle of the heart.''

Petitioner testified that he left the department September 28, 1953, because of his heart; that although he had improved he still had chest pains after excitement or exertion; that back in 1946, when he transferred to the alarm office, he had heart pains and shortness of breath on running or going upstairs. An assistant department chief testified as a witness for petitioner that there was considerable excitement in handling the work in the alarm office and that it was often referred to in the language of the firemen as ''a squirrel cage''; that petitioner had complained of chest pains as far back as 1941 when he had his first attack; that in 1946 or 1947 he and petitioner had responded to a four-alarm fire and that petitioner had then complained to his captain that when an alarm came in he would have pains and depressed feelings; that he had complained about pains in his chest before he went off the job in September. A captain testified that for 14 to 16 months he had noticed that petitioner was slowing down; that at times he would ask the captain to take over; that during the last week of his employment he complained ''I can't take it,'' and when he made these complaints would put his hand on his chest; that such incidents occurred from time to time and sometimes occurred on emergency calls; that on September 12, 1953, when he complained to the captain while on duty, his breath was very short and rapid.

Labor Code, section 3600, provides that liability for compensation exists against an employer for any injury sustained by his employee, arising out of and in the course of his employment where both employer and employee are subject to the compensation provisions of the code. With respect to members of city fire departments, section 3212 provides that the term ''injury'' includes ''heart trouble'' which develops or manifests itself during a period while such member is in the service of such department, and that such ''heart trouble'' so developing or manifesting itself shall in such cases ''be presumed to arise out of and in the course of employment.'' This presumption is declared to be disputable but the code provides that unless it is controverted by other evidence the commission is bound to find in accordance with it.

When petitioner had presented to the commission the foregoing evidence he had amply shown that heart trouble

had manifested itself, not once, but on many occasions during the period of his employment as a member of the Stockton City Fire Department. He had shown by the testimony of Dr. Gianelli that his heart trouble was coronary insufficiency and that it had existed as a progressive affliction to a point where in the doctor's opinion occlusion with resultant myocardial infarction was imminent and would follow further performance of duty. This condition, in the doctor's opinion, necessitated cessation of labor, hospitalization and remedial medication. Petitioner had shown that this condition still existed. Under the plain terms of the statute then, petitioner had shown an injury within the meaning of the workmen's compensation legislation and had shown that this injury had arisen out of and in the course of his employment. If there were any gaps or insufficiency in the evidence he had introduced, the gaps were closed and the insufficiencies were supplied by the statutory presumption.

Defendants called Dr. John T. McNally, who testified he had examined petitioner on September 17, 1953; that his subjective complaints were mostly of pain up the back of his neck, which he was unable to describe in any clear terminology so that the witness could determine the exact origin of it; that he sent him out for an electrocardiogram to Dr. Nathan Barbour and that he received a report from Dr. Barbour reading as follows:

"Following is the report on the Electrocardiogram taken on Mr. Harold R. Horn during his last illness.
19 September 53

ELECTROCARDIOGRAMS

| Mr. Harold Horn | Age 56 |
| | Weight 195 # |
| | Height 70″ |
| RATE .............. | About 68 |
| RHYTHM .......... | Sinus |
| INTERVALS ........ | PR 0.14 |
| | QRS 0.11 |
| | QT 0.40 |
| ABNORMALS ....... | Left axis deviation. |
| | QRS prolonged. |
| | aVL is qR |
| CONCLUSION ....... | These Electrocardiograms show rather marked left ventricular preponderance with horizontal type heart and a slight degree of interventricular block.'' |

Dr. McNally testified that on the basis of the subjective complaints above stated, that is, the pains up the back of the neck, together with his own physical examination disclosing a normal heart, with normal blood pressure, no swelling of ankles and no labored breathing, and on the basis of the electrocardiographic report it was his opinion that ''no [new] incident had occurred; certainly no myocardial infarction or any coronary occlusion.'' By no new incident he said he meant no myocardial infarction, no coronary occlusion, no irregularity to the heart, nothing to account for any injury to the heart *at that time*, but he said that this did not mean he had concluded nothing was wrong, for petitioner had these complaints which he, the witness was unable to tie in to any cardiac picture. He said he was not able to reach a diagnosis as to what petitioner was suffering from. Referring to Dr. Barbour's reports, and particularly to that part labeled ''Conclusions'' he said that a left preponderance in the heart position did not indicate anything particularly abnormal; that the reading ''QRS prolonged'' might indicate there had been a scar that delayed the transmission of the impulses across the heart muscle, but that Dr. Barbour was the expert on that. He said that petitioner's complaints made to him (that is, pains up the back of the neck) did not indicate heart ailment. Portions of the witness' report to the city on the occasion of his examination of petitioner were admitted in evidence. We quote the following parts thereof: ''An Electrocardiograph and a chest X-ray was obtained and reported as follows: Chest X-ray: negative, Electrocardiograph as reported by Dr. Nathan Barbour showed no definite *new* [italics ours] cardiac involvement but showed previous pathology;'' that the witness had reviewed petitioner's case history and found he had ''a definite Coronary Occlusion on November 26, 1940 and another heart attack on January 30, 1941.''

We think it obvious from the entire record in this case that the hearing, the referee's report and the findings of the commission all were unduly restricted and that the findings made do not properly dispose of the issues before the commission. It seems to have been the position of the commission, through its referee and as reflected in its findings, that, unless applicant on or about the date alleged in his application suffered something in the nature of occlusion or myocardial infarction, he could not recover even though he was suffering from heart trouble and had been so suffering for many years and even though this diseased condition of his heart had not

been disabling until the date which in his application he alleged to be the date of his injury. It is true that, using the form supplied by the commission, the applicant did not accurately plead his cause. Thus, although he alleged that, while employed as a city fireman by the city of Stockton he sustained injury arising out of and in the course of the employment, the form called for the fixing of "Date of Injury" and over those words and in the space allotted applicant wrote "September 12, 53." Having made the general allegation that while employed as such fireman he had sustained an injury arising out of and in the course of his employment he then was directed by the form to "Explain how Injury was Received" and in the space provided he wrote "Had Pain in Chest Wall while working." The form then required that he "State What Parts of Body were Injured and Subsequent Results" and in the space provided applicant wrote "Myocardial infarction." He then went on to state that he had left work on September 12, 1953, and was still out, and that he had furnished his own medical treatment. He responded to the requirements of the form by saying that the question which had arisen with respect to the liability of the employer or insurance carrier and the reason for filing his claim was "Temporary Disability, Medical Costs Expense, Permanent Disability, determination under Section 4850 of Labor Code." ▮ It is traditional with the commission and also required by the statute and case law that though applications for adjustment of claims may be required to be made upon forms furnished by the Commission, yet when made the application must receive the most liberal construction as to the issues tendered thereby. ▮ When this application is considered as a whole and is interpreted in view of the special statutory provisions as to what constitutes injury to city firemen and as to the relevant statutory presumptions, it is clear that the issues properly and sufficiently tendered by petitioner's application include these: Whether or not he was at the time of the application suffering heart trouble which had manifested itself during the period of his employment, that is, during the preceding 29 years; whether or not this heart trouble had reached the point by September 12, 1953, when he quit work, where it was disabling; whether or not this condition of the applicant's heart had resulted in temporary disability and whether or not it had resulted in permanent disability to any degree; whether or not his disease had arisen out of

and in the course of employment, and herein he was aided by the presumption. A proper disposition of this application could not be restricted to the issue of whether or not on September 12, 1953, he then suffered a heart attack or a myocardial infarction; yet it is apparent throughout the record and throughout the report and the findings that such was the referee's and the commission's concept of the issues tendered. Thus, applicant was asked if he recalled leaving the department some time in November, 1940, on a leave of absence and because of a heart attack. He answered affirmatively, but when his attorney sought to question him further concerning that occurrence the referee said: "What is the purpose of going into this? You trying to prove an injury in 1940?" The attorney stated he wished to show the type of work the man had been doing and whether or not he did such work when he had his first attack in 1940. Said the referee: "You allege an injury on September 12, 1953. . . . That doesn't cover any injury in 1940. . . . Let's start with the starting point and not go away back some time." Under the statute concerning heart trouble suffered by city firemen it was permissible in this hearing for this applicant to show that his trouble had manifested itself during his employment and to show if he could from the history of his illness, coupled with the nature of the work he was doing, that it was caused or aggravated and perhaps precipitated into disabling condition by reason of the nature of that employment. He was entitled to range over a wide period of time in order to show when and at what various times his trouble had manifested itself during his employment and to show if he could that his present alleged condition of disability was caused or contributed to by his employment. This he was not fairly allowed to do. For instance, when the assistant fire chief of the Stockton Fire Department was testifying the referee asked applicant's attorney: "You are going back to 1934, why?" Counsel replied: "I want to show some of these fires this man was engaged in." The referee replied: "You are going back to 1934. He had a coronary occlusion in 1940 and another one in 1941; those injuries are not a part of this." Counsel then asked concerning a fire to which Mr. Horn had responded in 1947. Said the referee: "That is rather remote from your allegation of injury in September 1953." Applicant's counsel stated: "I am trying to show the work and type of work this man did over this period of time, Mr. Referee." The referee stated: "That is not within your alle-

gation of the application. You have injury placed in issue. You allege he was injured in September 1953." Said counsel's attorney: "That is the period when he actually had this last attack." Replied the referee: "You don't allege it is an accumulation of all the work; you allege a specific injury." Counsel replied: "I can't allege this man had a dozen injuries in the last ten years; I have to allege there was a precipitating element on September 12th." The referee said: "That is, he had a preexisting heart pathology. Understand this type of pleading, you are trying to get a pleading now—you are trying to prove this disability is due to an industrial injury whether it is based on aggravation or not. It is admitted he had a preexisting heart pathology. You don't have an industrial heart unless a man had a preexisting heart pathology whether he is a fireman, policeman or ordinary working man. You don't get a heart attack from exertion unless you have a weak heart or arteriosclerosis, or unless you have a murmur or infarction, or, in other words, scar tissue on your heart." Applicant's counsel asked: "May we have a ruling of the Referee as to the limitation——" Referee: "You are trying to prove an injury—you allege an injury in September 1953." Attorney: "As to the last precipitating period——" Referee: "Here's the situation . . . In accordance with your contention, and the records of the city, this man had a very definite coronary occlusion in 1941. . . . That was caused by the employment. There is your injury date in 1941 and not today. The same in 1940— The coronary occlusion was November 1940, subsequent heart attack in January 1941; there's a definite incident. There's your injury date at that time." Counsel: "Well, of course, we will ask permission to go ahead and amend." Referee: "The statute of limitations should be pleaded. . . . Now, you've got the situation where these injuries of 1940 and 1941 are industrial or not is not important, not sufficient, because it merely establishes the fact the man did have a preexisting heart condition."

In his report the referee said:

"The application in this case is based upon the theory that apparently work immediately prior to September 12, 1953, caused a myocardial infarction. Assuming that the application merely attempts to allege that his employment at or about that time caused, or aggravated, some heart disease, there is still no evidence in the record that this was so. The evidence definitely indicates, from the testimony of the ap-

plicant himself, that he would have similar pains merely on walking or on slight exertion off the job as well as on the job. Certainly, there was no infarction. Subsequent to September 12, 1953, after tests, he was given medical treatment to prevent an infarction. None had actually occurred. Therefore, there can be no finding that applicant sustained injury arising out of and occurring in the course of his employment. It is interesting to note that the record indicates the history of two rather definite heart attacks. Whether or not these heart attacks arose out of and occurred in the course of his employment does not seem to be material in this proceeding.''

We turn now to the findings of fact. The commission found that applicant was a city fireman on September 12, 1953, and that his employer was insured under a medical excluded policy. The findings then continue:

''Applicant did not sustain any injury in his said employment on or about, or immediately prior to, September 12, 1953.

''The disability of which applicant complains was not prox-imately caused or aggravated, or at all caused or aggravated, by any injury arising out of and occurring in the course of his employment, or by his employment as herein alleged.''

No other findings were made. The finding that applicant did not sustain any injury on or about or immediately prior to September 12, 1953, does not dispose of the issues as to injury. As to the time element it is quite immaterial whether he did sustain injury during that brief period of time or on that date. He was prima facie entitled to an award if he had, within the provision of the statute as to injuries to firemen, become afflicted with heart trouble which manifested itself during the term of his employment. The statute plainly declares that if his heart trouble arises out of and in the course of his employment, then within the meaning of the Workmen's Compensation Law the fireman has sustained an injury.

We come now to the next and last finding:

''That the disability of which applicant complains was not proximately caused or aggravated, or at all caused or aggravated, by any injury arising out of and occurring in the course of his employment, or by his employment as herein alleged.''

We say, again, this finding, like the preceding finding, does not respond to the issues. It does not purport to say that the applicant does not suffer a disability. Neither does it

state that he has suffered a disability. It apparently assumes that applicant is disabled and, in view of the entire record, such a finding would be entirely reasonable, if not compelled. Treating it as a finding that there is disability of which the applicant complains, the finding then is that though there is such disability it was not caused by any injury arising out of and during the course of the employment. But there is no support in this record for such a finding. It was definitely shown that he suffered from heart trouble in 1940 and 1941, and though petitioner was somewhat impeded in making proof by the rulings of the referee, as we have noted, yet he did present evidence that for a long period of time this trouble had continued, had been complained of by him, and that his work had been lessened in recognition of the probability of such trouble. There was proof that for months preceding his examination by Dr. Gianelli and his consequent hospitalization he was increasingly unable to perform his work and there was definite testimony that his condition had progressed to a point where myocardial infarction impended, with its possibility of consequential death unless prevented. In addition to all of this, there was the statutory presumption that this heart trouble arose out of and in the course of his employment. The statute declares that the commission must find in accordance with this presumption unless it has been controverted. The only testimony in the record to which respondent can look to support its finding that the ''disability of which applicant complains'' is not proximately caused or aggravated by his employment is the testimony of Dr. McNally. That testimony rises no further than the expression of an opinion by Dr. McNally, based upon his own examination of applicant and the report to him by Dr. Barbour who took the electrocardiograms that, as of that time, he could not ascribe the *complaints of applicant* to any cardiac condition. But as we pointed out, the commission has not found that applicant is not suffering from cardiac trouble. Dr. McNally did not testify that, assuming existing heart trouble, it had not arisen out of applicant's employment, nor did he express any opinion upon that matter.

It is the duty of respondent, declared both by statutory and case law, to make findings upon all facts involved in the controversy. (Lab. Code., § 5313; *Moore Shipbuilding Co.* v. *Industrial Acc. Comm.*, 70 Cal.App. 495, 497 [233 P. 392].) This duty to find upon the issues involved in the controversy has not been performed by respondent. The

finding that applicant did not sustain any injury on or about September 12, 1953, tells us little and is certainly not decisive. The finding that applicant's disability did not arise out of or in the course of his employment is contrary to the statutory presumption which has not been controverted and the finding is, therefore, completely without support in the record.

The order appealed from is annulled, with directions to respondent to take further proceedings in accordance herewith.

Peek, J., and Schottky, J., concurred.

The petition of Respondent Industrial Accident Commission for a rehearing was denied December 17, 1954, and its petition for a hearing by the Supreme Court was denied January 12, 1955.